## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THURMAN HILL,

     *Plaintiff*,

*v.*                   CASE NO. 4:13-CV-15257

CAROLYN W. COLVIN        DISTRICT JUDGE MARK A. GOLDSMITH
Commissioner of Social Security,   MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.   RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment be **DENIED**, that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that the case be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings.

## II.   REPORT

### A.   Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Supplemental Security Income ("SSI")

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

under Title XVI, 42 U.S.C. § 1381 *et seq*. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 11.)

Plaintiff Thurman Hill was fifty-two years old during the most recent administrative hearing. (Transcript, Doc. 11 at 34.) He has worked on a factory-line, as a monitor at a substance abuse center, and as a roofer. (Tr. at 148.) On October 7, 2011, Plaintiff filed the present claim for SSI, alleging that he became unable to work on June 11, 1997. (Tr. at 118.)

The claim was denied at the initial administrative stage. (Tr. at 53.) In denying the claim, the Commissioner considered symptomatic human immunodeficiency virus ("HIV") and essential hypertension. (*Id.*) On June 22, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Oksana Xenos, who considered the application for benefits de novo. (Tr. at 31-52.) In her decision issued on August 15, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 19, 27.) Plaintiff requested a review of this decision on August 24, 2012. (Tr. at 14-15.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on September 27, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 6-8.) The Council extended the time for instituting a civil action, (Tr. at 1), and on December 27, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Compl., Doc. 1.)

**B.     Standard of Review**

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations for substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The

2

Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting

*Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

## C.      Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who

have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means

inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes

a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d

at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of

limitations caused by her impairments and the fact that she is precluded from performing her past

relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since October 7, 2011, the application date. (Tr. at 21.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: HIV, deep venous thrombosis ("DVT"), obesity, and gouty arthropathy. (Tr. at 21.) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 21-22.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 25.) The ALJ also found that Plaintiff was fifty-one years old on the application date, putting him in the "approaching advanced age" category. (*Id.*) *See* 20 C.F.R. §§ 404.1563, 416.963. (*Id.*) At step five, the ALJ found that Plaintiff could perform a limited range of light work in jobs existing in significant numbers in the regional economy. (Tr. 22-26.)

### E. Administrative Record

The first medical report is from the Michigan Department of Corrections's ("MDOC") special needs screening of Plaintiff on July 7, 2009 at the start of his incarceration. (Tr. at 34, 554,

556.) The registered nurse flagged three areas of concern: HIV, visual impairment, and cardiac conditions. (Tr. at 556.) Plaintiff had HIV since 1993. (Tr. at 554.) The nurse recommended accommodating Plaintiff's needs by assigning him the bottom bunk bed and excluding him from kitchen duty. (Tr. at 560.) Plaintiff denied all other health-related symptoms except high blood pressure, DVT, hepatitis, and Acquired Immune Deficiency Syndrome ("AIDS"). (Tr. at 562-64.) He also had herpes, and while the report stated it was "not active at this time," (Tr. at 564), a later unsigned note said it was "acute" and needed medication. (Tr. at 511.) He took various medications, (Tr. at 563), and Renee LeBeau, a physician's assistant, ordered more. (Tr. at 551, 553, 555.)

The next day Ms. LeBeau administered a comprehensive physical examination. (Tr. at 532-52.) Plaintiff reported the issues established the previous day–HIV, DVT, and hypertension–and added that he had pneumonia the previous year. (Tr. at 533-34.) However, he denied having any of a nearly page-long list of HIV symptoms. (Tr. at 544.) He had a Greenfield filter inserted in 1997 to treat his DVT and an embolism in his leg. (Tr. at 534, 539.) *See* Salil H. Patel & Rima Patel, *Inferior Vena Cava Filters for Recurrent Thrombosis: Current Evidence*, 34 Tex. Heart Inst. J. 187, 187 (2007). Her examination confirmed his cardiopulmonary problems. (Tr. at 537.) His body mass index, 40.27, (Tr. at 534), was considered obese under common standards. *See generally* Cent. Disease Control, *Defining Overweight and Obesity*, April 27, 2012, http://www.cdc.gov/obesity/adult/defining.html. Ms. LeBaeu observed that his facial features, scalp, vision, respiratory system, skin, nose, throat, mouth, sinuses, musculoskeletal system, neurological system, and neck range of motion were normal. (Tr. at 535-38, 545-50.) His appearance, demeanor, and behavior were likewise unexceptional. (Tr. at 539.) Ms. LeBaeu

planned additional testing and wrote orders for aspirin and Coumadin. (Tr. at 540-42.) She concluded that he had peripheral edema, but was clinically stable overall. (Tr. at 546.) She ordered prescription shoes on account of his edema and obesity. (Tr. at 519, 528, 530, 532.)  A similarly comprehensive mental health assessment conducted on July 13, 2009 did not report abnormalities except for alcohol and drug dependency. (Tr. at 520-26.)

On July 16, radiological tests results showed that "[c]hronic obstructive pulmonary disease is present," but that the "lung fields are free of acute disease process" and the "cardiac silhouette is unremarkable." (Tr. at 518.) The same day, Dr. Nyantara Jnananand extended the Coumadin prescription. (Tr. at 513.) On July 21, Dr. Jnananand examined Plaintiff, finding his general appearance, neck, and skin normal, though he had shallow ulcers in his mouth. (Tr. at 508.)

Dr. Vijaya Mamidipaka examined Plaintiff on July 27. (Tr. at 497.) Plaintiff again appeared normal and Dr. Mamidipaka found no lesions. (Tr. at 497-99.) He also reviewed Plaintiff's laboratory results, noting that the prothrombin time test measuring blood clotting was "low." (Tr. at 500.) Plaintiff followed up later that week with Deborah Ellenwood, a registered nurse, complaining of an allergic reaction to his wool blanket. (Tr. at 493.) She ordered new, non-wool blankets, (Tr. at 493, 496), but as of September 9, he still had not received them. (Tr. at 471.) Plaintiff also continued to consult with the infectious disease clinic, but the reports provide scant information on his condition. (Tr. at 488-89, 491-92, 511-12.)

In August, MDOC transferred Plaintiff to a new prison and the accompanying paperwork noted his updated special accommodations: he slept on a bottom bunk bed, was assigned "Other" work excluding kitchen duty, needed prescription shoes and glasses, and was "[a]t risk of heat related illness." (Tr. at 478, 481-82.) On August 17, Dr. Anita M. Noronha examined him at the

new facility. (Tr. at 476.) During this apparently brief session, she noted his blood pressure was "a little high," calculated he had lost six pounds since the last weighing, but did not observe any other abnormalities. (*Id.*) She planned a battery of tests for Plaintiff to complete in September. (Tr. at 476-77.) MDOC updated his accommodations list on September 16, adding support hose and cotton blankets and requiring him to stay in a ground-floor room. (Tr. at 462.)

Plaintiff noticed that the prison doctors had increased the dosage of one of his HIV medications, Zerit, and in October he questioned the reason for the change. (Tr. at 455.) An unsigned note, mentioning Plaintiff's questions, wrote, "His condition seems to be stable." (*Id.*) On October 12, he spoke with Dr. Paul Piper regarding the increase, learning that the change was recommended by an MDOC consulting physician, Dr. Craig Hutchinson; but Plaintiff maintained he had not treated with that doctor. (Tr. at 451.) In any case, he "otherwise ha[d] no complaints." (*Id.*)

In November, Dr. Hutchinson drafted a memorandum regarding Plaintiff. (Tr. at 447-48.) He noted Plaintiff's "unusual HIV regimen," notable for the low dosages of Zerit and Viracept. (Tr. at 447.) He ordered the Viracept increased and Plaintiff later acquiesced. (*Id.*) Dr. Hutchinson conducted a cursory examination "via telemedicine," noting that Plaintiff appeared comfortable, reciting Plaintiff's vitals and various test results, but concluding that he lacked "data" on Plaintiff's health. (*Id.*) He later wrote an addendum concerning the dosage of Viracept, which had been too low prior to incarceration. (Tr. at 449.) Dr. Hutchinson spoke with Dr. Bruce Johnson, Plaintiff's primary physician, regarding the dosage. (*Id.*) Dr. Johnson said his last contact with Plaintiff was "well over two years ago," and that "his general impression of Mr. Hill's adherence was that it was spotty at best." (*Id.*) He thought Plaintiff may have seen another physician, which could explain

10

the low dosage. (*Id.*) Dr. Hutchison decided "to continue the standard dosing of Viracept . . . ." (*Id.*)

Plaintiff went to the health center on December 29 after experiencing dizziness. (Tr. at 432.) The nurse observed, "Inmate's gait is rapid and steady. No diaphoresis. Pupils PERL and neuro check fine." (*Id.*) She noted that he missed dinner to visit his wife, and "[e]ncouraged [him] to eat dinner and watch fluids." (*Id.*)

A brief note by Dr. Paul Piper on January 13, 2010, stated he reviewed recent lab results and did not recommend treatment changes. (Tr. at 430.) The next substantive report came from Plaintiff's consultation with Antonia Rawlins, a registered nurse, regarding his swollen left leg. (Tr. at 421.) He estimated the pain was at eight and one-half out of ten on a visual analog ("VA") scale. (*Id.*) Ms. Rawlins confirmed the leg was "swollen and very warm to touch," but noted Plaintiff denied having chest pains or difficulty breathing. (*Id.*)

Dr. Hutchinson conducted another tele-examination on April 27. (Tr. at 413.) Genotype testing unveiled mutations that were rendering his medications inactive; consequently, Plaintiff "need[ed] to change [the] antiretroviral treatment regimen . . . ." (*Id.*) Dr. Hutchinson laid out the planned changes and ended by noting that Plaintiff "mention[ed] to me that he was hospitalized recently with what sounds like a recurrent deep venous thrombosis." (*Id.*)

Plaintiff went to the health center on June 2 to request a low sodium diet because, he claimed, "diet line [food] is better." (Tr. at 410.) The notes mention that he did calisthenics five times per week and had achieved "[d]esirable w[eight] loss." (*Id.*) The staff denied his request. (*Id.*)

11

Plaintiff consulted with Dr. Hutchinson again on July 7 regarding the results of the new HIV treatment regimen. (Tr. at 403.) He reported "[n]o side effects at all," and Dr. Hutchinson concluded, "[W]e have achieved full viral suppression and now can fine tune this regimen a little bit." (*Id.*) The next week, Plaintiff was "scheduled to [the health] clinic for [an] unknown reason," and while there told Dr. Piper he had "no complaints . . . ." (Tr. at 401.) There was a discernable purpose–checking on his Coumadin dosage–for his next visit, on July 27. (Tr. at 398.) His recent blood-clot tests were "sub-therapuetic," leading Dr. Piper to increase the Coumadin dosage. (*Id.*) Otherwise, Plaintiff "ha[d] no complaints and [was] tolerating the medicine." (*Id.*) The tests remained "subtherapuetic" in August and Dr. Piper again increased the dose. (Tr. at 395.) Plaintiff had no complaints and appeared "compliant with [the] medication." (*Id.*) Dr. Piper's next review of the blood-clotting tests in September did not prompt comment; instead he "renew[ed] Coumadin at [the] same dosage." (Tr. at 378.)

During the next "telemedicine consultation," on October 13, Dr. Hutchinson confirmed that the HIV remained in "full viral suppression." (Tr. at 357.) Plaintiff seemed "happy with this [treatment] regimen and his only complaint [was] a lack of energy." (*Id.*) Two weeks later, however, Plaintiff refused to allow the staff to draw blood for routine clot testing, stating he "does not need to have his [blood] drawn every week because his values have not been changing and his dose has not been changing." (Tr. at 348.) He demanded to speak with a physician before continuing with the tests. (*Id.*)

Plaintiff underwent a physical examination in early October. (Tr. at 367.) The examiner, Diana Marble, a nurse practicioner, clarified that Plaintiff had HIV but "no AIDS defining criteria." (*Id.*) She also noticed his hand had gout and there was a rash on his right knee. (*Id.*) He

was not fatigued, his respiratory system was fine, he had no chest or abdominal pain, and his genitourinary system was normal. (Tr. at 367-68.) "No edema is present," she continued, though Plaintif "states that he has it and it is 'bad.'" (Tr. at 368.) She concluded by noting that Plaintiff grumbled throughout his session, threatening to file grievances, apparently over medication refill charges. (*Id.*) He refused his next visit with the nurse on October 18 because "he only sees a 'doctor,'" (Tr. at 358), and the following month again would not let her examine him, trudging out of the clinic before he could even sign necessary paperwork. (Tr. at 346.) Later in November, after suffering from a painful psoriasis rash, he nonetheless continued to refuse seeing Ms. Marble, this time "because he [was not] going to pay for the visit." (Tr. at 344-45.) She wrote, "Upon arrival he stated that if he had to pay to be seen that he refused to be seen. I told the prisoner it is a chargeable visit because we have never seen him for this problem. So he said just give me my itenarary [sic] I ain't paying no five dollars." (Tr. at 342.)

His next physical examination report, on December 6, detailed a few new issues. (Tr. at 340.) He stated his blood-thinner treatments were recently changed, "but [he] refused to implement it until he had discussed it with a [physician]." (*Id.*) The examiner found thrombophlebitis, claudication, severe edema, and decreased pulses in his limbs. (Tr. at 340-41.) However, all other observations were normal. (*Id.*) The plan was to order tests, obtain new thromboembolism-deterrent hose, and tinker with his dosage schedule. (Tr. at 341.)

Three days later he was back at the health center after a twenty-five pound weight fell on his foot causing a one-inch wound. (Tr. at 338.) It was painful and swollen,  skewing his gait; but his pulses were "strong." (*Id.*) The physician's assistant gave him wraps, crutches, and Tylenol. (*Id.*)

He visited the center again in January 2011. (Tr. at 328-29.) His international normalized ratio ("INR") measurement was too high, indicating his blood was too thin. (Tr. at 329.) The nurse accordingly decreased his Coumadin dosage. (*Id.*) On the next visit, he inquired about his gout medication, which he still had not received. (Tr. at 328.) He continued to complain of gout in February, at one point telling the health center he could not walk due to gout pain, but improving later that day and cancelling his request to see the doctor. (Tr. at 320-21.)

In February, he returned to discuss the anticoagulation drugs. (Tr. at 325-26.) The examiner noted "thick scaled skin" on his legs and "[q]uarter[-]sized annular lesions on [his] right knee area," but otherwise he appeared normal and was not suffering from fatigue or chest pain. (*Id.*) He received a continuing order for petroleum jelly to help his skin. (Tr. at 270, 288, 307, 309, 312-13, 315, 323.) The notes state that the use of anticoagulants was "Good," and that the embolism and thrombosis in his legs were "Fair." (Tr. at 326.) An examination the next month reported similar results. (Tr. at 317-18.)

On April 12, Dr. Marvin Keeling examined Plaintiff. (Tr. at 295-98.) Plaintiff reported that his left leg frequently swelled, though he did not complain of pain. (Tr. at 295.) He adhered to his medications for hyperlipidemia, but was less observant of the diet and exercise program; the failure to follow it led to claudication. (*Id.*) Dr. Keeling noted that the varicosities in Plaintiff's left leg were severe. (Tr. at 296.) However, he did not have chest pain, diaphoreasis, dizziness, dysesthesias, heartburn, myalgia, nausea, irregular heartbeat, or chest pain. (*Id.*) His neck range of motion was "supple (normal)." (*Id.*) His hypertension was "Good," his phlebitis and thrombophlebitis were "Fair," and his use of anticoagulants was "Good." (Tr. at 297.) Dr. Keeling saw him again in May, making the same general comments in his report. (Tr. at 280-82.)

14

Dr. Hutchinson spoke with Plaintiff in May, though the notes fail to add new insights on Plaintiff's health. (Tr. at 263.) On June 2, Plaintiff refused to complete routine blood tests, telling Rosalie Petty, a registered nurse, "I don't want you to draw my blood." (Tr. at 264.) She responded that she was the only person available, but he still declined. (*Id.*)

Plaintiff injured his right index finger on June 8, 2011 while playing basketball. (Tr. at 256.) He "'fell down on top of a basketball," he explained, "'with my hand under me.'" (Tr. at 254.) It was tender, had limited range of motion, and was swollen and warm to the touch. (Tr. at 256.) Plaintiff could not move the finger, though the examiner suspected "[s]uboptimal effort . . . ." (Tr. at 254, 256.) X-rays later showed soft tissue swelling, arthritic changes, and "a tiny old avulsion fracture of the ulnar styloid." (Tr. at 245.)

Later in June, Plaintiff visited Dr. Keeling to discuss his gout, which was causing sharp and throbbing pain in his right wrist. (Tr. at 249.) He was otherwise unchanged, without back pain, muscle weakness, or neck stiffness. (*Id.*) The issues continued in July and August. (Tr. at 226, 234-35.) During the August appointment, the examining nurse observed that he walked to the health center without assistance but complained of pain in his hand. (*Id.*) The nurse injected an anti-inflammatory drug and advised him to continue using his other medications. (*Id.*)

On August 12, Dr. Keeling examined Plaintiff and wrote that his edema was mild, his varicosities were moderate, and his psoriasis had returned. (Tr. at 221.) In September, Dr. Hutchinson wrote a final report before Plaintiff's anticipated parole in October. (Tr. at 208.) He noted that Plaintiff's HIV remained in the "full viral suppression" as of May 10, 2011. (*Id.*) Extensive laboratory results, completed during the summer, were mostly normal; he had a few high measurements, such as those gauging blood-clotting, and a few low results. (Tr. at 193-98.)

On October 17, after his release, he saw his primary physician, Dr. Johnson, who noted that Plaintiff was weak and tired, but pointed to no other issues or abnormalities. (Tr. at 577.) "He has overall been doing well," Dr. Johnson wrote, adding that Plaintiff "[r]elates no major problems over the last 2-1/2 years. No hospitalizations." (*Id.*) Plaintiff returned on November 18 with a "hump on the back of his upper thoracic spine." (Tr. at 599.) It was "quite prominent," Dr. Johnson observed, potentially resulting from HIV medications. (*Id.*) He labeled it an adipose tissue buildup and referred Plaintiff to an infectious disease specialist. (*Id.*) Otherwise, Plaintiff was "doing well," and the physical examination uncovered no abnormalities. (*Id.*) On December 1, Plaintiff saw the specialist, Dr. Mohammad Wahiduzzamen, who recommended changing his viral medications. (Tr. at 590.) Plaintiff reported back on March 8, 2012 that he was feeling better.[2] (Tr. at 581.)

The DVT in his left leg became more painful, and on December 6 Plaintiff went to the hospital. (Tr. at 605.) Dr. Adam Rosh conducted the intake, noting that he suspected Plaintiff was not taking his full Coumadin dosages. (*Id.*) He ordered tests and wrote, "At this time patient seemed amply stable." (*Id.*) The ultrasound later confirmed the "chronic DVT with some soft tissue swelling." (*Id.*) It showed "lack of compressibility but with flow and waveform" in certain veins, and "normal compressiblity, waveform and flow" in other veins. (Tr. at 609.)

On December 15, Plaintiff visited Dr. Johnson. (Tr. at 598.) The notes highlight the edema and "[f]luid retention secondary to salt overutilization and probably some to do with amlodipine." (*Id.*) Plaintiff was weak and tired, but otherwise everything remained unchanged: his mouth and throat were not painful; he had no respiratory, gastrointenstinal, or genitourinary issues; his lungs were clear; and his heart rhythm was regular. (Tr. at 577, 598.)

---

[2] The text is barely legible but this appears to be what Dr. Wahiduzzamen wrote.

Plaintiff did not follow Dr. Johnson's dosage instructions and, during the next visit on January 3, 2012, the doctor re-explained the need to take higher dosages. (Tr. at 597.) Plaintiff agreed to abide this time. (*Id.*) Upon examining Plaintiff, Dr. Johnson found "some pain with range of motion of the right upper extremity. At the shoulder, there is pain on palpitation," which he classified as tendinitis. (*Id.*) No other pain or limitations were noted: "Otherwise, he is doing well. Feels well. Pain is controlled. No change focally. No change in cardiopulmonary, [gastrointestinal], or genitourinary." (*Id.*) By the next appointment, Plaintiff had taken the higher dosages without any side effects. (Tr. at 596.) He was again otherwise normal, and Dr. Johnson did not indicate that Plaintiff's shoulder still hurt. (*Id.*) The report for January 24 is likewise unexceptional: "Overall doing well. Feels well. INR [blood-clot measurement] finally normal for being on treatment." (Tr. at 595.)

Plaintiff told Dr. Johnson on March 1 that he had suffered upper respiratory symptoms for the past two weeks, and also had one off-color bowel movement. (Tr. at 594.) But the examination showed he was "Hemoccult negative," and he admittedly had no chest pain or other symptoms. (*Id.*) Dr. Johnson decided to adjust his Coumadin and also planned to test for peptic ulcer disease. (*Id.*) No respiratory problems are noted in the next report, from April 10. (Tr. at 593.) In this "follow-up" visit, Plaintiff was "[i]n general doing relatively well. INR [blood-clot measurement] 2 consecutive readings are good. No chills. No fever. No diaphorcsis, nausea, vomiting." (*Id.*) During the final recorded appointment, on June 7, Plaintiff reported left knee and right shoulder pain. (Tr. at 612.) Dr. Johnson noted the tendinitis and also added, "Probably some degree of medial collateral ligament damage. Right shoulder there is range of motion, however, pain [sic]

17

with range of motion." (*Id.*) Again, his blood-clot measurements were good and "[i]n general," Plaintiff was "doing well this visitation." (*Id.*)

Dr. Johnson filled out a functional capacity form the week after his last visit. (Tr. at 615-18.) He had seen Plaintiff "for 5+ years [and] [Plaintiff] typically schedules his appointments to be seen 1-2x per month." (Tr. at 615.) The diagnosis included tendinitis, osteoarthritis, medial collateral ligament injury, HIV, morbid obesity, recurrent DVT, hypertension, and gout. (*Id.*) Plaintiff was weak and tired, and had left knee and right shoulder pain. (*Id.*) Apparently, Plaintiff used a cane due to his edema and DVT. (*Id.*) His symptoms would constantly interfere with his concentration and rendered him "[i]ncapable of even 'low stress' jobs." (Tr. at 616.) Dr. Johnson explained this conclusion by noting Plaintiff "suffers from physical impairments that prevent him from working in a stressful environment." (*Id.*) Plaintiff could walk zero to one blocks and, if at work, sit for zero minutes "before needing to get up" and stand for zero minutes "before needing to sit down, walk around, etc." (*Id.*) Plaintiff's inability to sit or stand for longer than zero minutes would require him, in any potential job, to shift positions at will from sitting to standing and walking. (*Id.*) He would need thirty-minute, unscheduled breaks one to two times per day. (Tr. at 617.) He required a cane, but would not need his legs elevated at work. (*Id.*) He could never lift less or more than ten pounds, look down, turn his head right or left, look up, hold his head in a static position, twist, stoop, crouch, climb ladders, or climb stairs. (Tr. at 617-18.) He also suffered significant limitations reaching, handling, and fingering. (Tr. at 618.) Some days would be worse than others, and Plaintiff would likely miss work more than four days per month. (Tr. at 618.)

Plaintiff filled out a similar report on October 26, 2011, a few days after he left prison. (Tr. at 159-66.) He could not work, he claimed, because the medication kept him drowsy, his muscles

ached, his swollen leg needed to stay elevated, and he was frequently short of breath. (Tr. at 159.) These symptoms prevented him from sleeping longer than three hours "at a time." (Tr. at 160.) He spent his days watching television and preparing meals, though he handled his personal care without assistance and did not need reminders to take his medicine. (Tr. at 160-61.) He did "none to very little" household chores, and he said it took him "all day" to do so. (Tr. at 161.) He did not drive, but he could ride in a car and he left his home daily. (Tr. at 162.) He attended church and played cards with friends once or twice per week. (*Id.*) Social situations and relationship did not bother him, though he was conscious of the hump on his back. (Tr. at 164.) Moving on to his physical limitations, he said he had difficulty lifting, squatting, bending, standing, walking, kneeling, and climbing stairs. (*Id.*) One block was his walking limit; he would need to rest five to ten minutes afterwards. (*Id.*) He could complete tasks, "get along with authority figures," follow spoken instructions, and handle changed routines. (Tr. at 164-65.) He did not use a cane, but did wear glasses daily. (Tr. at 165.)

On November 21, state agency medical consultant Dr. Muhammad Ahmed completed a residual functional capacity ("RFC") report. (Tr. at 59-60.) He concluded that Plaintiff could occasionally life twenty pounds, frequently lift ten pounds, stand or walk for six hours in a workday, sit for six hours in a workday, push or pull without restriction, frequently balance, and occasionally climb ladders and stairs, stoop, kneel, crouch, and crawl. (*Id.*)

At the administrative hearing on June 22, 2012, Plaintiff testified that he had completed one year of college and was currently attending classes to earn a four-year degree in small business management. (Tr. at 35.) He went to a classroom once per week and completed the rest online.

(*Id.*) He intended to complete the degree, obtain "a Master's degree in counseling and hopefully
. . . open up . . . a rehabilitation business . . . ." (Tr. at 38.)

> He last worked in 2002, and was not currently working because, he said,
>
> I can't perform the . . . work that I was doing. I [was] working for Daimler Chrysler
> and I can't perform the work now. I can't stay on my leg for hours, doing assembly
> line work. And sitting down, I can't sit down because my legs constantly swells up
> and I have to keep it propped.

(Tr. at 36.) In class he could "sit down and get up and . . . move around." (*Id.*) Even if he had the
same flexibility at a job, he explained, he could not work "because of the pain." (*Id.*) In particular,
the leg swelling, DVT, and arthritis all caused pain and, since 2009, his legs would swell whenever
he walked. (Tr. at 38, 42.) He used a cane everyday, which he brought to the hearing, and claimed
a doctor prescribed it. (Tr. at 38-39.) With it, he could walk one block; without it, half of a block.
(Tr. at 39.) However, the medications helped and, he continued, a new medication was "helping
a little bit better" than the old ones. (Tr. at 40.) After sitting for one and a half hours or standing
from fifteen to twenty minutes, he would experience discomfort. (Tr. at 41.) The ALJ asked if he
could lift twenty pounds, but he did not know the answer because he had not tried lifting after his
doctor told him not to move heavy objects. (*Id.*)

He could not drive, but did attend church, watched two to three hours of television per day,
and read novels in addition to his studies. (Tr. at 40-41.) He denied using drugs or alcohol, though
he admitted to smoking four to five cigarettes per day. (Tr. at 42-43.) At night, he would sleep five
to six hours, supplemented by daytime naps. (Tr. at 43.) Family and friends visited him, mostly for
casual discussions over meals. (*Id.*)

Plaintiff's attorney then asked how long it took for the leg pain or swelling to subside. (Tr.
at 44.) "Overnight; when I lie down and go to sleep overnight and wake up in the morning, the leg

will be back almost normal," he replied. (*Id.*) When they swelled during the day he elevated them

on a chair. (*Id.*) His classes were flexible, allowing him to lie down if he had a bad day. (Tr. at 45.)

Nonetheless, the pain disrupted his concentration at times, when working on assignments or

watching television. (*Id.*) On these occasions, he would "just . . . lay back and just deal with the

pain." (*Id.*) Breathing became difficult if he took "[l]ong walks, like from here over across

to–across the street" or if he climbed stairs. (*Id.*)

At the shelter where he stayed, meals were prepared by staff, housekeepers cleaned, and the

staff did his laundry. (Tr. at 46.) He said, "I'll sweep my room sometimes. . . . I mean if I waste

something, I'll sweep that up, you know." (*Id.*)

The ALJ then posed a hypothetical to the vocational expert ("VE"):

> Please assume an individual of the Claimant's age on the date of the application,
> which was 51, a high school, plus some college education and the past work
> experience who can perform work at the light exertional level; cannot climb ladders,
> ropes or scaffolds; can occasionally climb stairs and ramps, balance, stoop, kneel,
> crouch and crawl.

(Tr. at 47.) Could such a person perform Plaintiff's past work? she asked. (*Id.*) The VE responded

that Plaintiff's past work as a case aide and assembly worker "would fall within that RFC." (Tr.

at 47-48.) Additionally, most light, unskilled work "would fall within that RFC," for example

assembler and production workers (9000 positions in Michigan), inspectors (5000 positions in

Michigan), and hand packagers (8000 positions in Michigan). (Tr. at 48.) The ALJ then added

restrictions: a sit-stand option at will would eliminate his past jobs. (*Id.*) He could still perform the

other jobs mentioned, but "the numbers would go down to approximately 2,500 for the assembler,

1,500 for the inspector and about 2,000 for the hand packager." (Tr. at 49.) Additional foot or leg

control limitations would not affect his conclusion, nor would overhead reaching restrictions, use

of a cane, or leg elevation during scheduled breaks. (*Id.*) However, if Plaintiff was "off task up to

20 percent of the workday," there would be no jobs available. (Tr. at 50.)

Plaintiff's attorney asked a hypothetical:

If we assume a hypothetical individual with the same age, education and work experience as the Claimant who would be able to sit for less than two hours total and stand/walk for less than two hours total in an eight-hour day, would that individual be able to perform the Claimant's past work or any other work . . . .

(Tr. at 51.) This RFC level would preclude all the jobs the VE had mentioned. (*Id.*) Absences of

more than four days per month would also "eliminate all occupations." (*Id.*)

## F.      Analysis and Conclusions

## 1.      Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he had the RFC to

perform a limited range of light work:

The Claimant can occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, sit for approximately six hours in an eight-hour workday and walk or stand for six hours in an eight-hour workday. The claimant is unable to climb ladders, ropes, or scaffolds. He can occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. The claimant requires a sit/stand at will option at the workstation. He is unable to operate foot or leg controls. The claimant can occasionally reach overhead with his right upper extremity. He requires a cane for ambulating distances greater than half a block. The claimant needs to be able to elevate his legs to hip level during regularly scheduled breaks and lunch periods.

(Tr. at 22.) Light work

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

22

20 C.F.R. §§ 404.1567(a), 416.967(a).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

## 2.   Substantial Evidence

Plaintiff levies two arguments against the ALJ's decision, the language and content of each mirroring the other's. (Tr. at 6-18.) First, the ALJ erred by finding that Plaintiff was not entirely credible "'concerning the intensity, persistence and limiting effects of [the] symptoms' . . . ." (Doc. 13 at 7 (quoting Tr. at 24).) He criticizes the ALJ's analysis as "boilerplate," and fails to find any "specific reasons" in it for the decision. (*Id.* at 8.) In contrast, he claims that the "objective medical evidence provides objective evidence to support findings of HIV and DVT, among other impairments." (*Id.*) Additionally, he reported fatigue at every visit with Dr. Johnson. (*Id.* at 9.) Plaintiff then summarizes Dr. Johnson's RFC and the hearing testimony.[3]

Next, he asserts that he cannot meet the ALJ's RFC. (*Id.* at 12-13.) The analysis is regurgitated from the first argument: Plaintiff has various impairments, (*id.* at 14), he consistently felt weak and tired, (*id.*), Dr. Johnson wrote a strict RFC, (*id.* at 14-15), and Plaintiff testified to his serious limitations, (*id.* at 15-16). These mistakes led to an erroneous hypothetical that did not account for Plaintiff's frequently swollen legs. (*Id.* at 17.) Plaintiff's Response to Defendant's

---

[3] Plaintiff ends the section by discussing *Richardson v. Heckler*, 750 F.2d 506 (6th Cir. 1984), stating, "[C]ourts in the Sixth Circuit have ruled that if records of disabling conditions exist prior to and after the relevant period, that [sic] a presumption of Disability [sic] can be established." (Doc. 13 at 11.) How this case is relevant is unclear. Plaintiff presents no records preceding his claimed onset date of June 11, 1997. (Tr. at 118.) It appears that this section of Plaintiff's brief was pasted from another case handled by his counsel: the text here uses the possessive or genitive pronoun "her" to refer to Plaintiff and cites language from an ALJ decision not present in this case's record. (Doc. 13 at 11-12.) Parties should be observant when drafting briefs and not skimp the editing. *See* Bryan A. Garner, *The Winning Brief* (2d ed. 2003).

Motion is much the same, adding that the ALJ unduly emphasized his schooling and entrepreneurial ambitions. (Doc. 15 at 3-4.)

### a.   Medical Sources, Plaintiff's Credibility, and the RFC

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513, 416.913. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527, 416.927. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. §§ 404.1527(c), 416.927(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. §§ 404.1527(c), 416.927(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § § 404.1527(d), 416.927(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled

or unable to work, whether an impairment meets or equals a Listing, the individual's RFC,[4] and the application of vocational factors. *Id.* §§ 404.1527(d)(3), 416.927(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms"); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be

---

[4] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. §§ 404.1513(b)-(c), 416.927(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

> sufficiently specific to make clear to any subsequent reviewers the weight the
> adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an

ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels*

*v. Sec. of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273,

1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not

simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792,

at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting

the opinions and for explaining precisely how those reasons affected the weight accorded the

opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be

justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be

made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility

of the claimant, considering the claimant's statements about pain or other symptoms with the rest

of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p.

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See*

*Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's

credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc.*

*Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307

F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a

claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d

at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. §§ 404.1528(a)., 416.928(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)      [D]aily activities;

(ii)     The location, duration, frequency, and intensity of . . . pain;

(iii)    Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

28

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing the RFC. "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [the] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis. *Jones*, 336 F.3d at

474. In the first four steps, the claimant must prove her RFC. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to the RFC, 20 C.F.R. §§ 404.1560(c), 416.960(c); *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

### b.  Analysis

#### 1.  The ALJ's Errors

The ALJ did not adequately explain her credibility analysis or provide "good reasons" for rejecting Dr. Johnson's proposed RFC. *See* 20 C.F.R. § 416.927(c). I suggest neither error is harmless. Combined, they wracked the entire analytical portion of the decision, leaving the Court little else to review. Finding them harmless would require constructing the ALJ's argument anew, from the facts she cites in the decision, and very many in the record that she does not. This would allow the harmless error rule to engulf the principles established in *S.E.C. v. Chenery*, 318 U.S. 80 (1943) (hereinafter "*Chenery I*").

The ALJ's sparse analysis pervades both errors: the decision is almost purely descriptive, merely condensing the evidence instead of analyzing it. Her credibility analysis spans two concise paragraphs:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the

30

extent they are inconsistent with the above residual functional capacity assessment.

The evidence indicates that the claimant is not as limited as he alleges. He testified that he is attending the University of Phoenix and plans to graduate in four years with a degree in small business management. The class requires one day of attendance, with the remainder occurring online. The purpose of the degree is to obtain employment. Therefore, the claimant's testimony indicates that he believes he is able to perform work activities despite his condition.

(Tr. at 24.) Judge Richard Posner has described language mirroring the first paragraph: "It is not only boilerplate; it is meaningless boilerplate. . . . [because it] yields no clue to what weight the trier of fact gave the testimony." *Parker v. Astrue*, 597 F. 3d 920, 922 (7th Cir. 2010). The ALJ's single explicit reason for finding Plaintiff incredible is his college enrollment. She even leaves out Plaintiff's desire to obtain a masters degree and not only find employment but start his own business. (Tr. at 38.)

Attending college can show that an applicant is not disabled. *See Tindell v. Barnhart*, 444 F.3d 1002, 1006 (8th Cir. Cir. 2006) (noting claimant's college attendance in credibility analysis); *Alexander v. Apfel*, 17 F. App'x 298, 301 (6th Cir. 2001) (noting that college attendance can be used as evidence in some circumstances); *Tennant v Apfel*, 224 F.3d 869, 871 (8th Cir. 2000) ("It was also proper for the District Court to consider Plaintiff's part-time college attendance, as carrying 17 credit hours of chiropractic classes while maintaining a C average appears inconsistent with allegedly disabling joint pain and fatigue."); *Hammond v. Chater*, 116 F.3d 1480, 1997 WL 338719, at *2 (6th Cir. 1997) (unpublished table decision) (noting that college attendance provided evidence); *Meney v. Astrue*, 793 F. Supp. 2d 621, 626 (W.D. N.Y. 2011) (rejecting medical opinions that claimant was disabled in part because of her "demonstrated ability to complete college coursework"); *Bridges v. Comm'r of Soc. Sec.*, No. 1:09 CV 2872, 2011 WL 1113442, at

31

*3 (N.D. Ohio Jan. 12, 2011) ("Full-time college attendance provided substantial evidence to contradict Plaintiff's claim of inability to engage in substantial gainful work activity."). Future career plans, particularly relatively ambitious ones such as Plaintiff's, seem to suggest that the applicant is currently overselling the impairments. Without any reason to think Plaintiff's health will improve by the time he finishes college, the only difference between him now and four years hence is the academic degree. Lack of a degree does not provide grounds for disability. *But cf. Parish v. Califano*, 642 F.2d 188, 192 (6th Cir. 1981) ("Persons who are admittedly completely disabled are sometimes able to attend school on a part-time basis to seek specialized or advanced training that may enable them to be gainfully employed.").

But the ALJ rushes to embrace this conclusion in the face of more circumspect language from the Sixth Circuit. In *Parish v. Califano*, the Sixth Circuit dealt with a claimant who had attended college part-time during the disability period. *Id.* Her schooling did not convince the court she could handle gainful employment: "Attending college on a part-time basis is not the equivalent of being able to engage in substantial gainful employment." *Id.* at 191. Course work has flexibility that most jobs lack, the opinion noted. *Id.* at 191-92. The court again expounded on the value of college-attendance evidence in *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524 (6th Cir. 1992). There, the claimant held a doctorate in educational sociology, was a professional ballroom dancer who continued dancing during the disability period, and attended law school part-time. *Id.* at 526-30. The court held that part-time school attendance, while probative, "did not amount to substantial evidence by itself . . . ." *Alexander*, 17 F. App'x at 301 (explaining *Cohen*'s holding). The Circuit has elsewhere, however, used schooling as evidence the applicant is not

disabled. *See Hare v. Comm'r of Soc. Sec.*, 37 F. App'x 773, 776 (6th Cir. 2002); *Alexander*, 17 F. App'x at 301; *Hammond*, 1997 WL 338719, at *2.

The critical distinction between these lines of cases is the nature of the illness: would the specific impairment allow the applicant to meet the demands of classes but not jobs? As the court in *Alexander v. Apfel* explained, a person suffering from chronic fatigue, like the plaintiff in *Cohen*, might attend school but not work because the illness is "'characterized by periods of exacerbation and remission.'" 17 F. App'x at 301 (quoting *Cohen*, 964 F.2d at 530). The applicant in *Alexander*, in contrast, suffered from depression, not marked by periods of remission. *Id.* Similarly, in *Hare v. Commissioner of Soc. Sec.*, the court found that the claimant's ability to attend college, where she would have to write "notes and tests," disproved her contention that she could not use her right arm to write. 37 F. App'x at 776. Therefore it was useful evidence. *Id.*

Here, Plaintiff could plausibly attend one class per week while completing the rest online and still remain unemployable. His primary complaints are his leg and shoulder pains. (Tr. at 40.) He estimated that he could sit for one and a half hours, which would likely get him through most of his in-class session. (Tr. at 41.) And he testified that during class he could "sit down and get up and move around." (Tr. at 36.) The nature of his illness, then, renders the schooling evidence less persuasive. Even assuming that the ALJ considered this by including a "sit/stand at will option," Plaintiff currently only needs to exercise such an option one day per week at class, likely for less than eight hours. (Tr. at 22.) The online portions are flexible, and he testified that he can rest when he needs to and finish them later. (Tr. at 44-45.) Most importantly, schooling is the only evidence the ALJ explicitly cites in her credibility analysis. Though he goes full-time, he completes most

of the program online; thus, the warning in *Parish* that part-time schooling alone is not substantial evidence is persuasive here, if it does not apply outright. 642 F.2d at 192.

Additionally, a future career "plan" might be a mere "hope," which does not indicate a present belief that he can work, but rather represents a goal he is pursuing. If Plaintiff is disabled now, it does not matter that he hopes he is not disabled four years from now. *See Cohen*, 964 F.2d at 530 ("We believe that the level of activity maintained by Cohen since she began suffering from the Chronic Epstein-Bar virus and the associated chronic fatigue syndrome is a tribute to her courage and determination in refusing to surrender to the debilitating effects of her illness. Her activities do not, however, warrant a finding that Cohen maintained the residual functional capacity to . . . maintain substantial gainful employment . . . .").

Missing from the credibility analysis are multiple required factors. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). She does not analyze or even mention the consistency of his statements. She lists his daily activities; yet, except for the school evidence, again fails to logically connect them to her conclusion. (Tr. at 23.) She likewise lists his medications, treatments, and aggravating factors, (Tr. at 22-24), but she does not discuss his work history or the consistency of his subjective complaints. SSR 96-7p, 1996 WL 374186, at *5.

The ALJ next mentions Dr. Ahmed's conclusions. Again, she never explains why she finds them persuasive, instead copying tautological boilerplate and adding befuddling filler: "The undersigned assigns this opinion great weight to the extent it is consistent with the residual functional capacity, as the claimant's reports of his school attendance are consistent with Dr. Ahmend's assessment." (Tr. at 24.) First, the ALJ developed the RFC, so to say she credits the opinion "to the extent" it is consistent with the RFC essentially says she agrees with it to the extent

it agrees with her. The only outside reason she gives for adopting it is that Plaintiff goes to school. (Tr. at 24.) While school attendance might show non-disability, the ALJ does not bridge the analytical gap showing how attending almost entirely online classes equates with such things as occasionally lifting twenty pounds, frequently lifting ten, or occasionally stooping. (Tr. at 59-60.) Thus here, as elsewhere, the ALJ "fails to build a logical bridge between the facts of the case and the outcome." *Parker*, 597 F.3d at 921.

She similarly disposes of Dr. Johnson's opinion. Before addressing her analysis, however, it is important to point out that Dr. Johnson should be considered a treating source. 20 C.F.R. § 416.927. "Acceptable medical sources" qualify as treating sources only if they are "licensed physicians" or "licensed or certified psychologists." 20 C.F.R. §§ 404.1513(a)(1)-(2), 416.913(a)(1)-(2). *See also* SSR 06-03p, 2006 WL 2329939, at *1-2 (2006). Additionally, to become a treating source, the relationship between the physician and claimant must have been "ongoing." 20 C.F.R. §§ 404.1502, 416.902. That is, treatments or evaluations must have occurred "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s)." *Id.* Infrequent consultations or a brief period of treatment often preclude a source from this category. *See, e.g.*, *Smith*, 482 F.3d at 876 (finding that two physicians who each treated claimant once were not treating sources).

In the Sixth Circuit, "more than one examination is required to attain treating-physician status." *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n.16 (W.D. Mich. 2008). *See also Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 414-15 (6th Cir. 2004) (treating a claimant only once is insufficient for treating status); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (same); *Atterberry v. Sec. of Health & Human Servs.*, 871 F.2d 567, 571 (6th Cir. 1989) (same).

35

Moreover, "depending on the circumstances and nature of the alleged condition, two to three visits often will not suffice for an ongoing treatment relationship." *Kornecky*, 167 F. App'x at 506. *See also Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 n.3 (6th Circ. 2011) ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is a treating source."). Finally, a physician the claimant consults only to obtain a report for her disability claim is not a treating source. 20 C.F.R. §§ 404.1502, 416.902.

Dr. Johnson is a licensed physician, thus an acceptable source, who treated Plaintiff over a five year period. (Tr. at 449, 615.) There was a potentially large gap in treatments however. In his functional capacity report, Dr. Johnson implied that he saw Plaintiff once or twice per month for the past five years and the ALJ accepted this in her opinion. (Tr. at 24, 615.) Both were wrong. In November of 2009, according to Dr. Hutchinson's notes, Dr. Johnson stated he had not seen Plaintiff in "well over two years . . . ." (Tr. at 449.) Plaintiff was incarcerated from July 2009 until October 2011, and MDOC's extensive medical records do not indicate Plaintiff saw Dr. Johnson in that period. (Tr. at 193-556.) Thus, Dr. Johnson did not treat Plaintiff from roughly November 2007 until October 2011, an almost four year gap. There must have been some prior relationship, however, and once Plaintiff left jail he did see Dr. Johnson nearly once per month. (Tr. at 577-618.) The post-prison appointments appear routine given Plaintiff's various impairments. Occurring frequently and covering Plaintiff's health in detail over an extended period, the visits after incarceration alone suffice to establish a treating relationship, whatever the prior relationship. Consequently, the ALJ had to give "good reasons" for the weight she accorded Dr. Johnson's medical opinions. 20 C.F.R. § 416.927(c)(2).

The ALJ's lengthy paragraph describing Dr. Johnson's capacity opinion ends with a single sentence containing her entire analysis: "The undersigned assigns this opinion little weight because it is inconsistent with his treatment notes . . . which noted on several occasions that the claimant was generally doing well." (Tr. at 24-25.) Indeed, a person who is well is "[s]ound in health; free or recovered from sickness or infirmity." *Well Definition*, *OED.com*, Oxford English Dictionary, http://www.oed.com/view/Entry/226980?rskey=Mn0k0o&result=3&isAdvanced=false#eid (subscription service, last visited October 22, 2014). But this is hardly the kind of incisive medical observation that can sink a detailed capacity opinion. In the notes, Dr. Johnson seems to use the term casually, making it unclear that whether he meant it to describe a healthy condition all should aspire to, or rather a relatively good condition given Plaintiff's long list of ailments. Even if the former, Dr. Johnson only wrote it in a little over half the recorded sessions (Tr. at 577, 593, 595, 597, 612.) In contrast, Plaintiff was weak and tired in all but one session (Tr. at 577, 593-98, 612), went to the hospital once between visits, (Tr. at 605), complained of respiratory problems in one, (Tr. at 594), had leg-swelling in another, (Tr. at 598), and reported leg and shoulder pain multiple times. (Tr. at 597, 612.) Thus, aside from ignoring contrary evidence, the ALJ has not provided "good reasons" to reject the opinion.

She omits many other required factors when discussing Dr. Ahmed's and Dr. Johnson's opinions. 20 C.F.R. §§ 404.1527(c), 416.927(c). To the extent she includes the factors, she does so descriptively rather than analytically. For example, she includes facts that fit under the length of treatment factor: she states that Dr. Ahmed examined Plaintiff once and Dr. Johnson saw him once or twice per month for five years.[5] How this factor related to her analysis is unknown.

---

[5] As mentioned above, this is false.

Evidently, it did not influence her, or else she would have given more weight to what she believed was a half decade of consistent treatment over a one-time assessment. She was not bound to do so, but she must explain why the length of the relationship was unimportant here. The only explanation available is that Dr. Ahmed's opinion is more persuasive because Plaintiff attends online school, while Dr. Johnson's is less so because he wrote during visits that Plaintiff was "well." As discussed above, this does not provide substantial evidence. The ALJ also errs to the extent she rejects Dr. Johnson's opinion "simply because another physician [Dr. Ahmed] has reached a contrary conclusion." *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009).

### 2.    The Errors Are Not Harmless

Whether these errors are harmless is a close question. Almost the entire record points to finding Plaintiff is not disabled. Aside from Dr. Johnson's report, very little evidence exists to establish disability. Moreover, the ALJ ignored much of the most probative evidence that supports her conclusion. Even so, because the ALJ's only rationales do not provide substantial evidence, finding the errors harmless here would essentially require the Court to rewrite the ALJ's decision from scratch rather than simply supplement and clarify it. In other words, the errors do not merely detract from an otherwise sturdy decision, they remove its bases altogether. The heightened standard for finding harmless error for violations of the "good reasons" requirement, 20 C.F.R. § 416.927, likewise cautions the Court against recommending excusing the errors. *Wilson*, 378 F.3d at 547.

Applied in this context, the harmless error rule is an exception to the principles laid out in *Chenery I. See Berryhill v. Shalala*, 4. F.3d 993, 1993 WL 361792, at *7 (6th Cir. 1993) (unpublished table decision); *Shara Coal Co. v. Office of Workers' Compensation Programs, U.S.*

*Dep't of Labor*, 946 F.2d 554, 558 (7th Cir. 1991); Amy R. Motomura, *Rethinking Administrative Law's* Chenery *Doctrine: Lessons from Patent Appeals at the Federal Circuit*, 53 Santa Clara L. Rev. 817, 831 (2013); Henry J. Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L. J. 199, 211 (1969). Consequently, while "courts should not be obtuse to reasons implicit in the [administrative] determination itself," Friendly, *supra*, at 222, nor should they "dissolve the *Chenery* doctrine in an acid of harmless error." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

In *Chenery I* and its sequel, *S.E.C. v. Chenery*, 332 U.S. 194 (1947) (hereinafter "*Chenery II*"), the Court set the boundaries for judicial review of agency decisions, seeking to prevent courts from "intrud[ing] upon the domain which Congress has exclusively entrusted to an administrative agency." *Chenery I*, 318 U.S. at 89. Explaining its decision four years later, the Court added,

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery II*, 332 U.S. at 196. Thus, the government as a litigant cannot provide, and the court cannot develop or accept, after-the-fact rationalizations for the agency decision "that the agency had not relied on in its [disputed] decision . . . ." *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010). *See also Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (citing *Chenery I* and holding, "But these are not reasons that appear in the ALJ's opinion, and thus they cannot be used here"). Every Circuit has applied the *Chenery* doctrine to social security decisions. *See* Bryan C. Bond, *Taking it on the* Chenery*: Should the Principles of* Chenery I *Apply in Social Security Disability*

39

*Cases?* 86 Notre Dame L. Rev. 2157, 2159 & n.11 (2011) (collecting cases). The Supreme Court recently applied the harmless error rule to veterans' benefits cases, requiring the party attacking the agency's decision to show its harmful effects. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). The Ninth Circuit found this case "applies to Social Security cases as well as [Veterans Affairs] cases." *McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2011). The Sixth Circuit has applied *Chenery I* in a social security decision, explaining, "[I]n large part, an agency's decision must be affirmed on the grounds noted in the decision." *Berryhill*, 1993 WL 361792, at *7.

Shortly after establishing the *Chenery* doctrine, the Supreme Court launched a line of cases explaining how it fit with the harmless error rule. In *Massachusetts Trustees of Eastern Gas & Fuel Associates v. United States*, the agency failed to identify the source of its authority but the court would not remand despite the error. 377 U.S. 235 (1964). First, the Court noted that "it seems patently clear that [the agency's] determination would have in no way varied" without the error. *Id.* at 247. Additionally, it refused to extend *Chenery I* to cases where the "mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached . . . ." *Id.* at 248. Later, in *N.L.R.B. v. Wyman-Gordon Co.*, the Court denied remand where the agency relied on an improperly promulgated rule: "To remand would be an idle and useless formality. *Chenery* does not require that we convert judicial review of agency decisions into a ping-pong game." 394 U.S. 759, 766 n.6. Again, the crux of the Court's analysis was that the error clearly did not effect the outcome. *Id.* However, the Court has recently stressed, in a related context, that the reviewing court "'is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an

40

inquiry.'" *I.N.S. v. Orlando Ventura*, 547 U.S. 12, 16 (2002) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). Instead, the court should ordinarily remand the case. *Id.*

The boundless variety of potential errors created a thicket of case law that taxed a legal mind as talented as Judge Henry Friendy's, who wrote, "Determination when to reverse and remand a decision that an administrative agency had power to make, and sufficient evidence to support, is, I fear, perhaps more an art than a science." Friendly, *supra*, at 200. He discerned three basic scenarios in 1969; the two relevant here include (1) "where the agency has rested decision on an unsustainable reason, the court should generally reverse and remand even though it discerns a possibility, even a strong one, that by another course of reasoning the agency might come to the same result," *id.* at 222, and (2) where the agency relies on a "wrong reason," remand "is necessary only when the reviewing court concludes there is a significant chance that but for the error the agency might have reached a different result," *id.* at 211.

Courts currently characterize the rule in nearly identical terms. As Judge Posner put it, "If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time." *Spiva*, 628 F.3d at 353. Courts will not toss even weak claims on harmless-error grounds unless the error meets that test. *Parker*, 597 F.3d at 924.

The Sixth Circuit first detailed the interaction between *Chenery I* and harmless error in *Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792 (1993). Borrowing the First Circuit's language, the court noted that harmless error applied where the mistake did not affect the procedure or substance of the decision, and where the court was not "'in substantial doubt whether the

administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture . . . .'" *Id.* at *7 (quoting *Kurzon v. United States Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976)). Remand is unnecessary "unless 'the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) (quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1993)).

The court has since applied the harmless-error rule in multiple cases. In *Heston v. Commissioner of Social Security*, for example, the court stressed that judicial review "must be based on the record as a whole" and reviewing courts could "look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." 245 F.3d 528, 535 (6th Cir. 2001). Accordingly, the error there–the ALJ's failure to reference a treating source's summary of evidence–did not require remand because the unmentioned evidence did not add useful information. *Id.* The court later found in *Reynolds v. Commissioner of Social Security* that an ALJ's failure to analyze evidence at step three made "meaningful judicial review" impossible and was therefore not harmless. 424 F. App'x 411, 416 (6th Cir. 2011). *See also Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005); *New v. Colvin*, No. 12-219-ART, 2013 WL 4400522, at *6 (E.D. Ky. Aug. 13, 2013); *Barbera v. Comm'r of Soc. Sec.*, No. 11-cv-13265, 2012 WL 2458284, at *11-13 (E.D. Mich. June 5, 2012), *adopted by* 2012 WL 2389977 (E.D. Mich. June 25, 2012). The Tenth Circuit has stated, "[T]o the extent a harmless-error determination rests on legal or evidentiary matters not considered by the ALJ, it risks violating the general rule against post hoc justification of administrative action recognized in [*Chenery*]." *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). Nonetheless, a court can "supply a missing dispositive finding under the

rubric of harmless error in the right exceptional circumstance," where the court can base its analysis on facts the ALJ actually, though improperly considered. *Id.*

Thus, while *Heston* allows courts to scan the record for evidence, *Reynolds*, at least implicitly, absolves reviewing courts from having to construct the entire argument from the record when the ALJ forgets to do so. Indeed, a court reviewing the record cannot find harmless error simply because the record contains substantial evidence supporting the ALJ, particularly where there is conflicting or inconclusive evidence. *See Rabbers*, 582 F.3d at 657-58; *Layton ex rel. B.O. v. Colvin*, No. 12-12934, 2013 WL 5372798, at *8 (E.D. Mich. Sept. 25, 2013) (adopting Report and Recommendation).

The Sixth Circuit uses harmless-error analysis to review credibility determinations. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). There, the ALJ misread a few facts in the record. *Id.* at 713. The error did not change the outcome, and thus was harmless because he cited additional facts that together constituted substantial evidence despite the mistake. *Id.* at 713-14. In contrast, where the non-erroneous rationales fail to support the ALJ's decision, the mistakes are not harmless. *Riser v. Comm'r of Soc. Sec.*, No. 13-11135, 2014 WL 1260127, at *18 (E.D. Mich. Mar. 26, 2014) (adopting Report and Recommendation).

Finally, this Circuit employs a "circumscribed form of harmless error review . . . [in] the context of the reasons-giving requirement of [20 C.F.R.] § 404.1527(d)(2)." *Rabbers*, 582 F.3d at 656. The ALJ in *Wilson v. Commissioner of Social Security* did not give "good reasons" for the weight he provided a treating physician's opinions. 378 F.3d at 545. The court refused to brush this off as harmless because the "good reasons" regulation conferred a substantial procedural protection. *Id.* at 546-47. Drawing from reasoning in the cases discussed above, the Court rejected

43

the argument that it could excuse this procedural error "simply because . . . there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely." *Id.* at 546. And where there are no medical opinions contradicting the erroneously rejected treating source, the court will remand. *See Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 862 (6th Cir. 2011).

The *Wilson* court offered three potential grounds for harmless errors in this context: (1) where the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) where the ALJ adopted the opinion or made findings consistent with it, or (3) where the ALJ "met the goal of § 1527(d)(2) [927(d)(2)] . . . ." *Wilson*, 378 F.3d at 547. These conditions do not leave much room for finding harmless error. *See, e.g.*, *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) (refusing to find harmless error where the ALJ "discussed no opinions contrary to that of [the rejected treating source] other than that of the reviewing physician"). "Patently deficient" opinions, in particular, are rare. *See, e.g.*, *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011) (finding no deficiency where the ALJ used the source's opinion for applicant's "category of diagnosis"); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409-10 (6th Cir. 2009) (finding no deficiency where source's opinion was "not inconsistent" with objective findings); *Zaft v. Comm'r of Soc. Sec.*, No. 12-13415, 2013 WL 5340772, at *11 (E.D. Mich. Sept. 23, 2013) (finding no deficience because ALJ adopted the source's opinion regarding "plaintiff's diagnosis"); *Davis v. Astrue*, No. 3:08-CV-434, 2010 WL 546444, at *7 (E.D. Tenn. Feb. 10, 2010) (finding no deficiency where source's treatment notes were "at the very least, not inconsistent with his opinion"). *But see Watters v. Comm'r of Soc. Sec.*, 530 F. App'x 419, 423 (6th Cir. 2013) (finding patent deficiency where opinion was "not supported by anything other than

44

[source's] inferred onset date of [claimant's] disability," which in turn was based on conjecture); *McKeehan v. Astrue*, No. 03-137-GWU, 2009 WL 1704334, at *5 (E.D. Ky. June 17, 2009) ("The most recent functional capacity assessment of Dr. Watts is simply incredible in that it limits the plaintiff to no sitting, standing, or walking."). Despite using the term "Patent," Black's Law Dictionary 946 (Abridged 8th ed. 2005) ("Obvious; apparent"), the courts will compare the opinion to record evidence to determine deficiency. *See Ratliff v. Astrue*, No. 7:09-CV-128, 2010 WL 2624127, at *6 (E.D. Ky. June 28, 2010) ("[T]he Court finds that there is enough evidence in the record supporting Dr. King's opinions that they are not so patently deficient that the Commissioner could not possibly have credited them.").

Though the record here has abundant evidence to support the ALJ's ultimate decision, the Court recommends remand. Few if any of Plaintiff's medical records show severe limitations. His routine physical examinations raised no flags. (Tr. at 476, 497, 532-52.) Treatment notes regularly stated that he had "no complaints," (Tr. at 451), or was not in pain. (Tr. at 295.) When he claimed symptoms, objective evidence sometimes contradicted the magnitude of his assertions, (Tr. at 432), or the problems quickly subsided, (Tr. at 320-21). His adherence to treatment plans was lackluster at times. (Tr. at 264, 295, 398, 3340, 344-46.) Nonetheless, the record also lends his contention support: numerous reports show that his leg would swell and ache, and gout affected his hands. (Tr. at 234-35, 249, 321, 325-26, 340-41, 421.) The ALJ described some of this evidence but skirted it when analyzing Plaintiff's functional capacity. (Tr. at 23-24.)

Other issues with Plaintiff's case, and Dr. Johnson's opinion, went unmentioned in the ALJ's decision. Plaintiff asserts he became disabled in 1997, (Tr. at 118, 182), apparently because the Greenfield filter was inserted that year. (Tr. at 534, 539.) Yet somehow he cobbled together

his most fruitful years at work, judged by earnings, after 1997. (Tr. at 135-41, 148.) *See Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678 (6th Cir. 2013) (upholding ALJ's decision to deny benefits where claimant "reported doing some roofing in 2006 after the onset of disability"). Confusion also shrouds his cane use. None of the prison records mention a cane, even those listing his special accommodations. (Tr. at 271, 274, 284, 289, 303, 462, 478, 481-82, 560.) In his October 26, 2011 report, Plaintiff stated he did not use a cane. (Tr. at 165.) A little over half a year later, he hobbled into the administrative hearing with a cane, testifying that a doctor prescribed it and he used it everyday. (Tr. at 38-39.) No records verify the prescription.

His string of injuries in prison also suggests hidden vigor. In December 2010 he told a nurse "he dropped a 25 [pound] weight on top of [his] left foot." (Tr. at 338.) The notes do not add more detail; but he knew it weighed twenty-five pounds and he called it a "weight," implying the accident occurred while weight training. At the very least, he admitted lifting twenty-five pounds. Six months later he returned with a right-index finger injury earned while playing basketball. (Tr. at 254-56.)

Dr. Johnson's opinion flirts with patent deficiency, falling just short of that demanding standard. His first answer sets the tone–he writes that Plaintiff "has been a patient here for 5+ years [and] typically schedules his appointments to be seen 1-2x per month." (Tr. at 615.) As noted, this intimates a much closer relationship than they actually shared. Question five asked him to "characterize the nature, location, frequency, precipitating factors, and severity" of Plaintiff's pain. (*Id.*) He largely ignored the inquiry and instead copied most of the previous answer: "left knee pain + right shoulder pain. pain with range of motion with increased activity." (*Id.*) His answer to why he though Plaintiff "[i]ncapable of even 'low stress' jobs" was less than illuminating: "[Patient]

46

suffers from physical impairments that prevent him from working in a stressful environment." (Tr. at 616.)

Dr. Johnson then asserted that Plaintiff, in a competitive work situation, could sit for zero minutes "before needing to get up" and stand for zero minutes "before needing to sit down, walk around, etc." (*Id.*) The form answers did not force him to choose between zero minutes and, say, one hour; instead, he could have selected five, ten, fifteen, twenty, thirty, or forty-five minutes. (*Id.*) While Plaintiff may not be able to work full time, one can imagine some combination of sitting and standing that he could manage for ten minutes. Nonetheless, Plaintiff testified similarly, stating he could manage classes by alternatively sitting and standing, but could not do so at a job. (Tr. at 41.) Dr. Johnson's opinion and Plaintiff's testimony veered concerning whether Plaintiff needed to elevate his legs: Plaintiff asserted he did, (Tr. at 44, 159), but Dr. Johnson said he did not, (Tr. at 617). The opinion essentially asserts that Plaintiff cannot complete any activity at work: he cannot lift or carry less than ten pounds; lift or carry more or less than ten pounds; look down; turn his head to the right or left; look up; or hold his head in a "static position." (*Id.*) Granted, these answers match his opinion that Plaintiff cannot work; they nonetheless suggest hasty selections, especially given the lack of corroborating proof in the treatment notes. The difficulties with the opinion stem, in part, from the rigid multi-choice questions; but this too diminishes the opinion's persuasiveness. *See Cheatham v. Comm'r of Soc. Sec.*, No. 12-11428, 2013 WL 1843400, at *8 (E.D. Mich. Oct. 2, 2013) ("Dr. Soares did no more than simply check boxes indicating Plaintiff's various limitation.").

His treatment notes also lead one to believe he was either less than observant or an undutiful note keeper. He said each session that Plaintiff did not wear eyeglasses. (Tr. at 577, 593-

47

98, 612.) Perhaps Plaintiff slipped them off during the sessions, but the record clearly establishes Plaintiff used them. (Tr. at 165, 271, 274, 284, 289, 303, 462, 478, 481-82, 560.) A minor error no doubt, significant only because it rests on a pile of other mistakes.

The ALJ's analysis ignored most of this evidence. She instead offered only reasons that she could not properly rely on, at least not without additional support. Thus, she did not otherwise assemble substantial evidence in her findings. The case law described above counsels against using the record evidence to find harmless error here. Doing so would construct the ALJ's entire argument for her rather than simply patch a few holes in her decision.

Nor does the harmless error rule task courts with coaxing out the necessary analyses from threadbare ALJ decisions. The court may scan the entire decision to see if the ALJ addressed the regulatory factors elsewhere; but scattering bits of what should be discrete analyses across the decision hardly assures the court that the ALJ actually, and thoughtfully, undertook those analyses in the first place. The ALJ's decision should not require rigorous exegesis simply to excavate its meaning. Here, the ALJ included many relevant facts, but she did not connect those facts to her conclusions. *See Parker*, 597 F.3d at 921. Moreover, the Court cannot know how the Commissioner would analyze the overlooked evidence or reinterpret the evidence she improperly used.

### 3.    Conclusion

The record contains convincing evidence that Plaintiff is not disabled. But the only pieces of this the ALJ assembled proved insufficient or erroneous. Evidence supporting Plaintiff went unaddressed. Consequently, the Court recommends DENYING Defendant's Motion, GRANTING Plaintiff's Motion, and remanding to the Commissioner.

III.   **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.

If the Court determines that any objections are without merit, it may rule without awaiting the

response.


Date:  October 31, 2014                    /S PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


## CERTIFICATION

        I hereby certify that this Report and Recommendation was electronically filed this date
using the Court's CM/ECF system which delivers a copy to all counsel of record.

Date:  October 31, 2014                    By       s/Jean L. Broucek
                                           Case Manager to Magistrate Judge Morris